Good morning, everyone. Before we proceed to formally call the case, I want to make you aware that Justice Brennan is not able to be with us in person this morning. He is on the panel, and he is on Zoom, and he may be asking you questions, and you probably want to address your argument to him as well as the two of us that are sitting here up on the bench. Madam Clerk, will you please call the case? 322-0499, Mufaddal Real Estate Fund, LLC, a company cross-appellees by David Smith v. Vara School Professionals, Inc., Richard Dramato, Vivian Dramato, et al., appellees, cross-appellants. Mr. Smith, you may proceed. Thank you, Your Honor. Good morning, members of the panel, Mr. Heathcock. My name is David Smith, and may it please the Court, I represent the plaintiff in this case, Mufaddal Real Estate Fund, LLC. I am also present here today with Mr. Shadir Nomanboy, who is the managing member of the entity as well. Before I begin, obviously, there are a number of issues that have been raised in this appeal. For the Court's convenience, I will be addressing primarily those arguments raised by our appeal. Obviously, Mr. Heathcock has raised issues regarding impossibility of performance and the effect of the pandemic. I will primarily be addressing those in my response this morning. With respect to the late fee provision in the lease-set issue, as this Court is aware, it is axiomatic that a contract is to be enforced as written, and that all terms are to be given meaning and full force and effect. It is the Court's job not to interpret a contract in such a way so as to render any of the provisions meaningless. And that's very important in this case because it's our contention that the trial court did just that, respectfully, rendering a portion of the late fee provision at issue, in this case, effectively meaningless. Paragraph 2 of the lease-set issue in this case, which is attached to the brief also as Appendix A-1, states unequivocally that tenants shall pay rent per the following schedule, paid monthly in advance on the first day of the month. So our position is that the lease is clear, that rent or any rents are due on the first day of the month. The late fee at issue in this case is very specific, and its language is very important due to the issues that we've raised to the panel today. The late fee provision of the lease provides that all payments of rent and additional rent not received within five days of the due date shall be subject to a 5% late payment charge. And such charge shall be collected as additional rent. Now, that last portion, and such charge shall be collected as additional rent, is very important. And the reason being is that the lease makes plain that all rents are due on the first of each month. The language used in the lease is very specific and expressly provides that the late payment charge at issue, quote, shall be collected as additional rent. In other words, based on the language of paragraph 25, the first part says all payments of rent and additional rent not received within five days of the rent due date shall be subject to a 5% late payment charge. So any rent or additional rent that isn't paid by the first of the month, essentially, or within five days of that date, will incur a charge. That includes additional rent. The paragraph goes on to say that the late payment charge, or I'm sorry, and such charge shall be collected as additional rent. So effectively what that means is that once a late payment charge is assessed, that charge then becomes additional rent, which, pursuant to the plain language of the lease, is due on the first of each month. Excuse me. It's our position that, plaintiff's position I should say, I apologize, that the trial court's interpretation fails to give full force and effect to the language that's in the lease, which is very specific. The trial court in this case ultimately assessed effectively a one-time 5% late fee based on the rent set issue that were not paid. So the judgment amount of issue in this case, the principal liability, was $98,500, and then a one-time 5% charge on that amount for approximately $4,900. What, in the judgment order that entered in this case, specifically stated that the trial court granted those, excuse me, late fees based upon the assessment of a singular late payment charge. But the problem with that interpretation is that that's not what this provision says. What this provision says is that the late payment charge shall be collected as additional rent, and then of course it says that that additional rent shall be due on the first of each month. By interpreting this provision the way it did, the trial court effectively cut off that last part of that sentence. Counsel, how does the acceleration clause play into your analysis of the lease? So, very good question, Your Honor, and I understand it. The acceleration clause at issue in this case has a few things in it that I believe answers your question. First and foremost, it provides that, of course, in the event of a default, the landlord may issue a five-day notice, which did in fact occur in this case. It also provides that upon issuance, there are a lot of mays. So, in other words, it provides that landlord shall have the right to accelerate and aggregate the amount of the minimum rent due for the balance of the term. Upon default of this lease, the aggregate amount shall at once mature. However, prior, earlier in that paragraph, it states that upon service of that notice, the tenant must vacate. Under the facts of this case, it would be one thing if the notice was served, the tenants in fact vacated. Excuse me, I apologize. The tenants in fact vacated, and the acceleration clause was then invoked. That would be one thing, but that didn't occur here. The tenants remained in possession of the premises. Even if that amount was accelerated at that time, the tenants still remained in possession of the premises through the end of the term of the lease, as the undisputed facts show they ultimately vacated approximately seven months after that notice was served in December of 2020. So, effectively, the fact that the service of a notice may arguably accelerate the amounts due under the lease doesn't change the effect of that paragraph 25. In addition, the acceleration provision also provides that, in addition, tenants shall be liable for additional amounts over and above the minimum rent, which became due and payable under this lease during the balance of the term. So, in other words, what it says is, okay, the, and that's towards the bottom of paragraph 25. So, effectively, what it says is, excuse me, yes, if a five-day notice is served, arguably the liability is accelerated, or the debt is accelerated. However, any amounts which become due during the term of the lease shall still be the tenant's responsibility. In other words, although a five-day notice was served, which arguably accelerated the debt, the tenant, in fact, remained in possession of the property during the entire term of the lease, which then triggered that liability under the earlier portion of paragraph 25, if that answers your question. Okay. Thank you. Counsel? Yes, Your Honor. Excepting for the sake of analysis that your interpretation is correct, do you want to do a problem with the Hidden Grove condominium case and its analysis determining whether, quote, unquote, late charges are enforceable? Understood, Your Honor, and thank you for that question. I don't believe we do, and the reason being is that the facts of the Hidden Grove case are different than the facts at issue in this case, both in terms of what happened in that case as well as the terms of the late fee provision at issue itself. So, excuse me, in Hidden Grove, the defendant in that case, it was obviously a condominium action, remained in possession of the property, ultimately defaulted on assessments that were due, but then, in fact, paid those assessments. So one of the things that's different there is that in that case, there was actually a payment at issue, and the court was in a position to be able to determine with some degree of specificity to what extent a landlord may have, or I'm sorry, the association may have suffered damages. In addition, the late fee at issue in that case was a flat fee as opposed to the percentage that we have in this case. So as Justice Holdridge, I believe, noted in Hidden Grove, the $25 fee at issue in that case, the late fee, was approximately 28% of the $88.25 monthly assessment. And Justice Holdridge noted that although perhaps a one-time assessment of that amount may be appropriate, under the facts of that case, assessing $25 each month on an unpaid $88.25 ultimately equated to a 255% return under the facts of that case. In Hidden Grove, the defendant had ultimately paid approximately nine months later, so Justice Holdridge was in a position where he could say, well, this flat rate effectively going for nine straight months equated to a return of 255%. In our case, it is not a flat rate regardless of the amount outstanding. In Hidden Grove, it was. Regardless of what that amount was, it was this $25 a month, which under the facts of that case, according to Justice Holdridge, made that amount unreasonable. In our case, the late fee is 5%. In other words, it's proportionate to the amount that's outstanding. For example, on the ledger, which is also included in the appendix, the first month that the defendant failed to pay rent, the late fees were 5% of monthly rent, which is approximately $470 a month. Obviously, under the provisions of paragraph 25, my client's position is that as time goes on, that amount increases. But even at the end of the lease term, which would have been December of 2020, under the interpretation of the lease that we're putting forward to you today, the total late fees were approximately $31,000, which based on my math is approximately 32%. I know I'm taking a while answering your question, but the answer to your question is that under the facts of this case, both in light of the fact that we have nonpayment here and the aggregate amount of late fees at issue in this case, effectively at the end of the lease term, late fees were 32% in our case. In Hidden Grove, the example that Justice Holdred used, was effectively equated to 255%. Thank you for the question, Your Honor. Similarly, in Collins v. Hurst, likewise, the language of the lease at issue in that case was drastically different than the language at issue in the case before the panel. In Collins v. Hurst, that lease provided that the defendant would incur a service charge of 2% for that month for any payment not made. The plaintiff in that case made the argument that that 2% per month effectively kept on going, and up through the date of judgment, the court in Collins ultimately found that the late fee at issue was limited to one month and one month only because of that for-that-month language. Again, here we don't have that. This late fee provision in this lease is very specific, and by stating it's collectible as additional rent, it's not subject to that limitation. Likewise, I would draw the court's attention to the Andersonville case, which was also cited in the brief, and this also goes to your question, Justice Brennan, about Hidden Grove and its relationship to the facts of this case. In Andersonville, it was another case involving unpaid assessments by a homeowner under the Declaration of Bylaws. In that case, effectively, there was a 4% per month late fee provision which continued to accrue, and from a reading of the case, it appears that that language was the same or close to it as the language that we have in this case. Ultimately, the- The first district in Andersonville didn't discuss in some-well, that'd be the wrong way to look at it, but it didn't have as part of its analysis the first fraud of Hidden Grove. That is to say, whether the penalty was a reasonable forecast of just compensation of the harm that was caused by the breach. That wasn't something the Andersonville court considered, was it? Well, based on my reading of Andersonville, I believe that they did consider that. The court in Andersonville did state-excuse me-that it didn't specifically analyze, per se, whether the late fees at issue were a reasonable forecast of damages. However, Andersonville-the court in Andersonville did state that the late fees at-I'm sorry, the damages actually suffered by the plaintiff in Andersonville were difficult to determine based on the fact that there had been non-payment during the time period at issue, which- As a-let me ask you this. Do you believe that it's appropriate for purposes of determining whether this contract is reasonable that we consider whether the penalty reasonably reflects the actual damages? Do you think that's a proper approach for the public court to take if you had a blank slate? Understood, Your Honor. And I don't believe that that is necessarily an improper approach to take. I recognize that- If that is not an improper approach to take, or let's put it positively, that it's a proper approach to take, how is a 35% penalty for non-payment not excessive if, in fact, you actually got your money? Understood, Your Honor. And first, I would direct the court's attention to Hidden Grove. As stated in Hidden Grove, Justice Holder has indicated that a 28% one-time granted, but one-time charge of 28% may be reasonable. The amounts at issue in this case are 32, quite close. So I don't believe that the 32% at issue here at the end of the lease term, it's a factor that equates to an unreasonable fee based on the cases. Counsel, your time has expired. Justice Brennan, do you have any further questions? I don't. Thank you. Justice Davenport? Just in my mind, this was a five-year lease that everyone agreed would end after four, basically, correct? That they ended up leaving in 20. It was a five-year lease. The math says it would have ended in December of the next year, but they vacated and they ended the fourth year, and no one made any claim about any additional year, correct? Well, that's correct. So the lease actually had a provision that said the term of this lease shall be for 60 months, but then it referenced December 31st of 2021, and there was an issue with that. But, yes, the defendants did ultimately vacate December of 2020. Thank you, Counsel. Counsel, this is an appeal and cross-appeal. So what will happen is your Mr. Heathcock will get 15 minutes to argue, then you will get five minutes for rebuttal, then he will get five minutes for rebuttal. That's the process. Understood, Your Honor. Thank you. Thank you. Mr. Heathcock, you may proceed. And because we had confusion yesterday, you'll have 15 minutes now, then after, then you'll get five minutes of serve rebuttal. Very good. You may proceed. Thank you. May it please the Court. My name is Doug Heathcock. I am the attorney for the defendant in this case, who was the tenant, the Vera School. It was a cosmetology school, as well as three guarantors in this case. We referred to them throughout the trial court case as the Vera defendants. I'm probably just going to call them the tenants, to keep it simple. The other side wolf it all is the landlord. There are four main points today, and Counsel's only touched on a couple of them. I want to start with the main point, number one being that the court should not have entered judgment, summary judgment on the issue of rent in this case, which dealt with whether or not the rent should have abated during the time that the cosmetology school was shut down by the COVID-19 pandemic and the executive orders of Governor Pritzker. The second issue is in the alternative. If the court was correct in awarding rent to the landlord during that time, then the amounts of the late payment charges that the landlord awarded, that the court awarded were correct. It was correct in limiting it to one late payment charge per month of missed rent. The third issue is whether or not the court should have found that the landlord was the prevailing party and awarded attorney's fees at all as a prevailing party. The fourth issue is in the alternative. If the court correctly found that there was a prevailing party, the amount of attorney's fees that it awarded to the landlord were correct, and the court should not disturb that judgment either. So turning to the first point about the rent during the pandemic, we had three affirmative defenses, commercial frustration, impossibility, and then the defense under the lease itself related to the abatement of rent due to destruction of the premises. The court tackled impossibility and commercial frustration really together. And the court properly looked at the test for commercial frustration in Smith v. Roberts. That test is laid out simply as two parts. The frustrating event must not be reasonably foreseeable, and the value of the counterparty's performance must be totally or almost totally destroyed by the frustrating cause. Now, the court didn't have the guidance of case law at the time it decided this. This was fairly early in the pandemic, so I want to acknowledge that. After that time, a few cases have looked at whether or not this was foreseeable for commercial frustration purposes. One such case was 55 Jackson Acquisition v. Ronnie Restaurants, which we discuss in the brief. And in that case, the trial court had a restaurant in Chicago that was shut down by the executive orders during the COVID-19 pandemic. As a result of that, the restaurant stopped paying their rent, as happened to many businesses, and the lawsuit was brought by the landlord. The trial court said that this amounted to commercial frustration, the combination of the COVID-19 pandemic, which was unforeseeable in the executive orders, which required the business to be closed. And the trial court ordered that it was both commercially frustrated and found in favor of an impossibility, and it said that the rent would abate during the time that these orders remain in effect. It went up to the appellate court first district, and the appellate court first district eventually found in the decision that there was a question of fact and sent it back to the trial court. It said that it wasn't clear whether or not all the restaurants in the area had to shut down or you could have done carry out or some other things that restaurants did as a workaround. But before the first district appellate court sent it back, it made some rulings about the case. One of those was in paragraph 58 of its decision, and the appellate court there said, turning to the doctrines of impossibility, impracticability, and frustration, we find no genuine dispute that the parties did not and could not anticipate the circumstances allegedly causing impossibility. The COVID-19 pandemic and the public health orders, when they entered into the lease, nor that Roddy, that's the restaurant, did not contribute to the circumstances of the pandemic and said orders. They continued, similarly, we find no genuine dispute that the allegedly frustrating event, again, COVID-19, the orders were not reasonably foreseeable when the lease was formed. That decision came down after the trial court entered its order, and the trial court in this case did something completely different. Rather than finding, as the first district did, that the pandemic was not foreseeable and that the public health orders were not foreseeable and that this might very well be a case of commercial frustration and possibility, our trial judge said, as to the first prong, meaning the frustrating event being foreseeable, the court said, in its order, as in the first prong, the Illinois Supreme Court has specifically rejected the notion that a pandemic is so unforeseeable as to excuse contractual obligations. And it cited one case, Phelps v. School District No. 109 of Wayne County, a 1922 Supreme Court case. As we've stated in our briefs, that is far too broad an application of a Phelps case. The Phelps case, which is not mentioned in the Roddy case, the first district decided, or any other cases that I've seen that deal with the pandemic. Our trial court, again, searching for the correct answer, decided that this case that dealt with the Spanish flu, as they called it, it was an influenza epidemic in the late teens, 1919, that this one decision decided this issue completely. That because the court in that case found that a teacher should be paid while the school was closed during the Spanish flu outbreak, and it was not impossible for the school to pay her, that therefore it became reasonable from 1919, 1922, the day of the decision on, a century later, that this had to be reasonable per se. It had to be objectively reasonable. Counsel, did the Roddy case or the other case that you cited have force majeure provisions in the contract? Yes, well, the Roddy case had a force majeure provision, and they looked at it and said, it's not a true force majeure provision because it addresses only when the lease can be terminated. The provision in that case said, in the event of acts of God, if there are certain actions taken, then the lease can be terminated. And they said, that's not a true force majeure provision. It's interesting that you raised that, Justice, because in this case, under our lease, there is a provision titled force majeure, but it's also limited by its own language. Counsel has already urged the court to apply the contract in the terms it's written, and I agree with that statement. It's a statement of law. In our case, the force majeure title provision says, if there is something that must be done within a certain amount of time under the lease, and due to an act of God, you can't accomplish what must be accomplished under the lease in that period of time, then you'll have additional time to do it. And during that additional time, rent shall not abate, meaning you have to keep paying rent. So what that does is different than what happened here. That force majeure provision in our case says, first of all, it has to be a mandated time period under the lease. We're not dealing with that. We're dealing with the general lease term. Isn't the payment of rent a mandated time period? It is as far as when it must be paid, yes, by the first of the month. But here we're dealing with a possibility of commercial frustration, and neither side raised the force majeure clause before the trial court. The trial court mentioned that in its decision. Neither party raised that as a defense. We certainly didn't, and neither did the plaintiff invoke that, because no one was asking for an extension of time to do something. We weren't saying we need more time to pay the rent. We weren't crying poor. We were saying we should be forgiven from the rent because commercial frustration takes us outside of the lease. It takes it to the point where something that has happened that is unforeseeable, meaning the pandemic that shut down everything in a way that I submit no one could have predicted. Not in our lifetime, not in our grandparents' lifetime has anything like this happened. Mr. Ecott. Yes, sir. The force majeure provision specifically references governmental regulation, right? And that was an executive order that closed down BARR's ability to provide the services that would allow it to raise the money to pay rent. So the force majeure provision might not have provided the reason for the government regulation, but it certainly raised the specter that the parties had negotiated around what would happen if there was a government regulation. And it specifically provides that in that circumstance, right? You have to pay the rent, even if a government regulation otherwise prevents you from performing anything. And I don't know why that wouldn't include the payment of rent. And I raise this because if that's correct, then we don't get to the common law affirmative defenses of commercial frustration because the lease would control. So if you could address that specifically. Of course, Your Honor. Your point is well taken. The force majeure clause does mention government regulations and acts of God. And the trial court seemed to view that as saying, if you've mentioned it, you've considered it. The point we made in the trial court, and I'd like to reiterate here, is that it's mentioned in such a way that it's limited. The force majeure clause in this case only deals with what happens if there's a specific time period that is delayed and then more time is given. What occurred here with this unprecedented COVID-19 pandemic takes us away from that because it did not delay the time to do something as much as the parties contemplated. It came up with something the parties did not contemplate. And it really goes to the second prong of the Roberts test, Smith v. Roberts test, which is the destruction of the counterperformance. In this instance, we had mutual and reciprocal obligations between the parties. This is viewed kind of like, well, the tenant didn't pay the rent. Yes, but the landlord at the same time was obligated under the lease to provide us with the space that we could use for our cosmetology school. And it's important to note that the lease limits our use. Specifically, it says the only use we have is the cosmetology school and no other use. And in return for that provision of the space, for that specific use by the landlord, we pay rent. When the COVID-19 pandemic hit and the government shut out orders that you cannot occupy and use this space until we tell you otherwise, it destroyed the performance of both sides. The trial court, Judge Elian, addressing your point about the force de jure clause, as I say this, the trial court looked at the second element and said in its decision simply, as to the second element, the court finds that the value of Mufadal's performance was not completely or mostly destroyed. That's it. There's no how or why. And so when you have the force de jure provision, as in Roddy, it does what it does. It only addresses what it does. And Roddy, they found that it wasn't a broad force de jure provision. It was related only to termination of the lease. Our force de jure provision was related only to the extension of time, giving someone additional time to pay. That is not the situation we had as a matter of law. This was a situation where both performance by the tenant and the landlord were completely destroyed because there was nothing that could be done with that space during the time it was shut down. And it was unforeseeable to both of them. There is no evidence in the record, because there's no evidence in the trial court, that this was foreseeable to either party. The trial judge made a decision. He said he felt that he was bound by Phelps. He said that it was not his decision to do this, but he was bound by the president of Phelps. He actually stated, the court notes that its conclusions regarding foreseeability of the COVID-19 pandemic are not based on this court's own views, but rather on the Illinois Supreme Court's holding in Phelps. The court misapplied Phelps. The court should not have taken a decision from 1919 and said, henceforth, going forward, any pandemic cannot be commercially frustrating or raising possibility. Does that address your question, Your Honor? Yes, thank you. Thank you. I'd like to move on, then, to the issue of the, if the rent was properly awarded to the landlord. And I need to stress that the lease ended in December of 2020. There was not another year left on the lease. There was a scrutinous error in the original lease, and that was worked out in the pleadings. By the time the amended pleading was filed, they were not seeking another year's worth of rent. They were in the original complaint, so that was not an issue. The court has promptly hit upon two things. One is the Hidden Grove case and its progeny, the cases that say that a late charge is an unenforceable penalty if the purpose of the clause fixes damages and is merely to secure performance of the agreement. And it gives you the three-part, the two-part test. It says the amount is reasonable. It has to be a reasonable forecast for the compensation, and the harm caused must be difficult or impossible to estimate. And then it further says an unreasonable nature of the sum is proof of the penalty. There is no evidence whatsoever as to this amount being intended to cover reasonable costs incurred by the tenant. I'm sorry, incurred by the landlord. This had nothing to do with the amounts incurred by the landlord. The lease itself called for a singular. One day said, not receiving a day shall be subject to a 5% late penalty charge. So it specifies one late 5% penalty charge. So we don't agree with the argument that the language, and it should be collected as additional rent, makes that cumulative. That to us makes no logical sense, because all that says is when it's due, you need to get it paid to us with the next rent. It doesn't say it's cumulative. If it becomes cumulative, and the trial court ruled that it did not, it leads to an absurd conclusion. One, it has nothing to do with the costs actually incurred by the landlord. Two, it's solely, I see my time is up. If there are no further questions? Mr. Justice Brennan, do you have any further questions? None at this time. Thank you. Thank you. Counsel, you have five minutes in rebuttal. Thank you. I wanted to first address the force majeure provision of the lease, because I believe Justice Brennan's point is well taken. As the court is aware, the force majeure provisions of applicable leases have been considered and are relevant in cases like this. 55 Jackson reviewed the force majeure provision at issue in that case. LDS versus Fitness Blueprint did as well. This force majeure provision is a force majeure provision in the broader sense. At issue in 55 Jackson was the force majeure provision in that case effectively only referenced when and under what circumstances the lease can be terminated. The force majeure provision in our case specifically states that whenever a time period is provided for either party to do an act or thing, it shall be excused under the circumstances listed, except for the obligation to pay rent. The trial court was therefore correct in looking at this provision and determining that first this provision applies, because the obligation to pay rent is certainly something that is required in a specific time period. But under this provision, it is specifically accepted. And so I do think that— Mr. Smith? Yes, Your Honor. Mr. Heathcock suggested you did not raise the force majeure provision in support of your partial motion for summary judgment. Is that correct? That is not correct, Your Honor. I believe what Mr. Heathcock was getting at is that there were no pleadings related to the force majeure provision. In the motion for summary judgment and in the briefing related thereto, it was addressed and analyzed. All right, that was my understanding as well. Okay, thank you. Yes, Your Honor. Excuse me. Secondly, as far as the trial court's reliance on Phelps is concerned, the trial court did properly rely on that case. Phelps, obviously, is an older case. It's still good law. It's an Illinois Supreme Court case. And in that case, the Phelps court specifically determined that if this was something— the parties wanted to avoid their obligations under to pay the teacher, they could have added that into the applicable agreement, and they did not. Could you please discuss Roddy as it relates to this case? Yes, Your Honor. So as far as Roddy is concerned, first and foremost, Roddy does not stand for the general proposition that Mr. Heathcock proposes that the pandemic was unforeseeable such that—as a matter of law. And the reason why I say that is the Roddy case was very particular and engaged in a lengthy analysis of what the issues were at summary judgment, what the arguments were, what arguments were made, and what were not made. And based on the Roddy court's analysis, the issue at summary judgment, as I read the case, it was undisputed that the COVID pandemic was unforeseeable. Or in other words, the Roddy case, for purposes of its analysis, accepted that based on the fact that neither side at summary judgment argued that the pandemic was unforeseeable. And the court notes in that decision that certainly there were factual issues regarding whether Roddy could have, in fact, been open during that time because there was an impossibility defense. And I don't think that Roddy stands for the general proposition that, as a matter of law, a pandemic or epidemic is unforeseeable. I would just point out very briefly that, as I mentioned in my brief, LDS versus Fitness Blueprint, also from the First District, decided after Roddy. Granted, it's a Rule 23 decision, but expressly acknowledged Roddy. And in that case, the court did not agree with the tenant's commercial frustration defense that it posed. In other words, the court acknowledged the existence of Roddy, still ultimately found that, under the facts of that case, losing three or four months worth of occupancy under a 60-month lease did not destroy the counter value of performance. The only other thing that I would like to mention, I know my time is getting short, is I believe that trial court's reliance on PHELPS, in addition to the plain language of PHELPS, is correct. Because, as noted in applicable cases, particularly YPI North LaSalle, the question for the court to determine unforeseeability is not whether the event is unforeseeable, but whether the cause is. In other words, YPI makes a very specific distinction. In YPI, the issue was a developer was going to purchase, I see that my time is up. I'm sorry, would you like me to end? Just finish that part. Very good, thank you. In YPI, the issue was a developer was purchasing a large commercial property. They did not have a financing contingency in the contract, and the 2009 global credit crisis hit. The court in YPI said the global credit crisis, while that may not have been foreseeable, the cause or the event, the inability to obtain financing was. And similarly, while it is true that the COVID-19 pandemic specifically may not have been foreseeable, as the trial court noted in its ruling on summary judgment, certainly the possibility of a pandemic or epidemic generally is and could be contracted for. Thank you. Justice Brennan, do you have any questions? No, thank you. Justice Davenport? No, thank you. Thank you. Thank you, Your Honor. Mr. Heath-Pack, you have five minutes in your survey book. Thank you. I'd like to pick up the discussion where I left off, talking about the absurd penalty that comes about if this court were allowed to allow the late fees to be compounded. Again, evidence of the unreasonable penalty can show that this was intended to be a penalty. And what we had here got worse over time. That's the way cumulative fees work. They kept on adding 5% more every month. By the end of the lease, they were seeking late fees of $6,195 in December, so late fees of $6,200 just about on rent of $9,000-some dollars. And that was 63% of the rent due. That was at the end of the lease. By the time we got to the litigation, and this litigation took a while, during COVID, things dragged on. But in May of 2022, the amount they were seeking, total amount, again, with less than $100,000 due in rent total, they were looking for $298,000. And all of this is in the brief. We detail this quite a bit. And so that was 202% of the total amount of the rent owed was now sought as penalties and fees. That's got absolutely nothing to do with compensating the landlord for any actual expenses. There was no evidence as to that. And by the time we got to submitting judgment orders, and the court's judgment order came in September of 2022, they were seeking a total amount due on less than $100,000 worth of rent of $362,000, $485.50. And that amounted to late charges of 268% of the actual rent. So, again, taking this over time, counsel wants to say, well, our first late charge wasn't very much. Yes, but they're seeking $268,000 worth of late fees. And the court actually awarded them $103,435. That was the rent for 10 months and 10 late fees at 5% each month. Logical, consistent, it was correct. They were seeking 350% more than what the court actually awarded. So they wanted more than three and a half times what they actually got. That brings me to the point that has been raised. They were not the prevailing party. The lease has sufficient says the prevailing party should get its fees. And there are certainly tests for prevailing party. We're well aware of the test in Hensley v. Eckerhart. The difference here is that this case should have been found by the court to be a draw. And the reason for that is the court decided in early January of 2022 that it was going to grant summary judgment for them on the issue of rent, 10 months rent. We then spent the next nine months litigating over this late fee issue. And the court in its ruling denying the late fees that they sought as a penalty said that they were just off base, to quote the trial court. They were off base. And the court said in awarding attorney's fees to them, I still think they prevailed more. And the court's language, which we quote, which was colorful, was if this was a shootout, one of us was badly wounded as one of us was gravely wounded. And I'm going to give it to the person who was hurt more. We've given you the case law that you can look at with Powers v. Rockford Stop and Go and a federal case of Raphael v. Medallion Kitchens that says when it's this close, it's okay to say there is no single prevailing party. Call it a draw. When we prevailed and we stopped them from getting hundreds of thousands of dollars in late fees that we argued over for nine months, there should have been no prevailing party. The court should not have awarded them fees at all. The court did award them fees. And the last thing I'd like to address is they've said the court should not have limited the fees or reduced the fees. Well, the court, in its discretion, is able to do what it thinks is reasonably correct here. And it found that there was a separate issue related to the late fees. It had ruled on the summary judgment motion for the rent back in January. By the time it got to late fees, it said you are off base on this. I'm not awarding you these compounded late fees. It's not called for in the lease. It's a penalty. You're not going to get them. And it took out the attorney's fees related to that late fee issue. That was correct to do that. All of these issues come back to foreseeability, commercial frustration, impossibility, and what the court should have done. It's a novel case. It's even novel coming before this court today. But in looking at this, it does not seem that the court should say that anyone entering into a commercial lease in 2016 was unreasonable if they didn't consider the possibility of a global pandemic and executive orders that shut us all down. It just wasn't foreseeable. Thank you. Thank you, counsel. Justice Brennan, do you have any questions? No, thank you. Justice Davenport?  Thank you, counsel. Thank you for your time. We will take this matter under advisement and issue a written decision in due course.